THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CRUZ IBARRA JR., | ) | |
| | ) | |
| *Plaintiff,* | ) | No. 25 C 15779 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| | ) | |
| NORTHWESTERN UNIVERSITY, | ) | |
| | ) | |
| *Defendant.* | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff Cruz Ibarra Jr. brings this discrimination action against Defendant Northwestern University ("Northwestern" or the "University") related to his dismissal from a Ph.D. program. Ibarra asserts racial discrimination in violation of federal and state laws, as well as state law breach of contract, intentional infliction of emotional distress, and negligence claims. (Dkt. 27). Northwestern moves to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 16). For the reasons below, Northwestern's Motion to Dismiss [16] is granted.

**BACKGROUND**

The following facts are set forth in the Amended Complaint ("Complaint"), except where noted, which the Court accepts as true for purposes of a motion to dismiss.[1] *See Lavalais v. Village of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). Northwestern filed several exhibits in support

---

[1] On May 7, 2026, the Court granted Ibarra's unopposed motion to amend his complaint. (Dkt. 27). As indicated in the motion, the Amended Complaint adds a claim of racial discrimination under the Illinois Human Rights Act (Count VI) and a claim under the Civil Rights Remedies Restoration Act (Count VII). (Dkt. 27 ¶¶ 87-95). Ibarra added these Counts after the Illinois Department of Human Rights issued him a right-to-sue letter. (Dkt. 24 ¶¶ 2, 6). The parties agreed to keep the existing motion to dismiss briefing in effect because the Amended Complaint does not assert any new facts and because IHRA claims are analyzed similarly to Title VI and Section 1981 claims. (*Id.* ¶¶ 7-8). Accordingly, the Court will apply Northwestern's arguments regarding Counts I and II to Count V.

of its Motion. (Dkts. 18, 18-1, 18-2, 18-3, 18-4, 18-5). The Court may consider documents filed with a Rule 12(b)(6) motion without converting the motion into one for summary judgment if they are central to the plaintiff's claims and referenced in the complaint. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012) (citing Fed. R. Civ. Pro. 10(c)); *In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614, 638 n. 1 (N.D. Ill. 2025). Since the documents are central to Ibarra's claims and referenced in the Complaint, the Court will consider them in its analysis.

In February 2023, Ibarra was accepted into Northwestern's Environmental Engineering and Science Ph.D. program (hereinafter, the "Program") within the University's Department of Civil and Environmental Engineering ("CEE"). (Dkt. 27 ¶¶ 7, 29). He did not have a Master of Science ("M.S.") degree. (*Id.* ¶ 19). Ibarra joined the Program under an academic scholarship. (*Id.* ¶ 31).

## I.    Northwestern's Graduate School Policies

The CEE Department operates the Program pursuant to rules and policies promulgated in the CEE Doctor of Philosophy Student Handbook ("CEE Handbook") and The Graduate School Handbook ("TGS Handbook"). (*Id.* ¶¶ 9-10); (Ex. A, Dkt. 18-1); (Ex. B, Dkt. 18-1). Pursuant to the TGS Handbook, admission to a graduate program does not constitute or guarantee a student's admission to candidacy for a Ph.D. program. (Ex. A, Dkt. 18-1 at 20). To be admitted to candidacy, a student must pass a program-specific comprehensive qualification examination. (*Id.*). Admission to candidacy is also contingent upon the recommendation of the student's program and approval of The Graduate School ("TGS"). (*Id.*). Additionally, students must maintain "satisfactory academic progress" which requires, at minimum, that they (1) maintain an overall grade-point average ("GPA") over 3.0 and do not receive more than three incomplete grades; (2) get admitted to candidacy by their third year and complete their dissertation proposal by their fourth year; and

(3) complete their Ph.D. program within nine years. (*Id.*at 22). Individual programs may have additional criteria for determining a student's academic standing, which they must make clear in their materials. (*Id.*). Programs must also make clear any consequences for failing to meet their specific requirements. (*Id.*).

The CEE Handbook sets out several CEE-specific requirements for students to be admitted to candidacy. (Ex. B, Dkt. 18-2 at 6). First, students must complete a certain amount of coursework to be considered for admission for candidacy: nine units if a student has an M.S. degree and 12 units if a student does not. (*Id.*). Additionally, all students must (1) have a research advisor who has agreed to supervise their Ph.D. studies; (2) pass a qualifying exam; and (3) have a graduate GPA of 3.5. (*Id.*). CEE does not assign research advisors to students; instead, students are encouraged to reach out faculty to identify mutual interest. (*Id.*). CEE students must be admitted to candidacy by the sixth academic quarter of study, which falls in June of their second year. (*Id.*). The CEE Handbook incorporates the GPA requirement from the TGS Handbook—students must have a 3.0 GPA each quarter and a cumulative GPA of 3.0 to graduate. (*Id.* at 8).

A student who fails to make satisfactory progress as determined by TGS or their program will be placed on probation or dismissed. (Ex. A, Dkt. 18-1 at 22). TGS does not specify the circumstances wherein a student would be dismissed instead of placed on probation. If a student is placed on probation by TGS for failure to make satisfactory academic progress, TGS will notify the student and their program's director of the probation decision. (Ex. A, Dkt. 18-1 at 22). The student will have two quarters to resume satisfactory academic standing. (*Id.*). Individual programs may develop their own probation procedures, which they must make clear to students in a printed or electronic handbook. (*Id.*). Under the CEE Handbook, a student will be placed on probation if

their GPA falls below 3.0 in any quarter. (Ex. B, Dkt. 18-2 at 7). A student who has been placed on probation by CEE has up to two consecutive quarters to return to satisfactory progress. (*Id.*).

If a student is placed on probation by TGS and fails to remediate the probationary period, they will be dismissed from TGS. (*Id.* at 22-23). In these cases, the dismissal is final and cannot be appealed. (*Id.* at 23). A student may be dismissed by a program if they failed to make satisfactory academic progress according to the program-specific criteria or failed to remediate during a program-specific probation period. (*Id.*). A student may only be dismissed by a program if (1) the criteria for dismissal are clearly stated by the program in a handbook that has been effectively disseminated or via direct written communication to the student and (2) the dismissal is made from the program faculty or a subset of the faculty that includes the director of graduate studies. (*Id.*). Students may appeal a program's dismissal decision. (*Id.*). The CEE Handbook specifies that a student may be dismissed from a CEE program if, after the probationary period, they have not improved or have demonstrated an "inability to complete the work successfully in a given curriculum." (Ex. B, Dkt. 18-2 at 8). The CEE Handbook does not specify any additional criteria for dismissal. It also does not list any consequences for a student's failure to get admitted to candidacy on time.

The CEE Handbook allows for students to appeal decisions made about their academic progress if they feel that a decision was "unjust or based on incomplete or inaccurate information." (Ex. B, Dkt. 18-2 at 9). The CEE Handbook encourages students to bring their concerns to their advisor or another faculty member before filing an appeal to see if the issue is a "misunderstanding" that can be "resolved quickly." (*Id.*). Should a student file an appeal, CEE follows the grievance policy outlined in the TGS Handbook. (*Id.*). Pursuant to the TGS Handbook, a student who wishes to appeal a program's dismissal decision must submit a written appeal within

ten days of the "date of the program's final written determination of [dismissal] to the student." (*Id.*). There are only three grounds for appeal: (1) newly discovered information that was not previously available and could change the outcome; (2) procedural errors within the program's dismissal process that substantially affected the fairness of the process; and (3) the program's decision to dismiss was "manifestly contrary to the eight of the information presented (i.e., obviously unreasonable and unsupported by the great weight of information)". (*Id.*). The Dean of TGS may request additional information or a meeting with the student or program. (*Id.*). The Dean must reach a decision within 30 days of the submission of the appeal, and any decision reached is final. (*Id.*). If the Dean finds that any of the three grounds for appeal are present, they may amend the program's decision. (*Id.*). If not, the Dean will uphold the program's decision. (*Id.*).

## II.     Ibarra's Participation in the CEE Ph.D. Program

Ibarra asserts that, shortly after he began his studies in the Program, "it became apparent that [his] ethnicity and socioeconomic background were at odd with the [P]rogram's preferences." (*Id.* ¶ 32). On or about February 16, 2024, Ibarra attended a lunch event, during which he sat next to Dr. Kimberly Gray, the former CEE department chair. (*Id.* ¶ 33). According to Ibarra, Dr. Gray stated that "the CEE department has a 'strong preference for East Asian and French applicants' because educational institutions in these regions are 'much better' in comparison to smaller and less prestigious universities like [his] alma mater." (*Id.* at ¶ 34). As a Latino student from a "less prestigious" university, Ibarra was concerned that the statement demonstrated the University's bias towards "less esteemed academic institutions whose students are more likely to come from lower socioeconomic backgrounds." (*Id.* ¶ 35).

Ibarra asserts that he was subjected to further discriminatory treatment beginning in April 2024. (*Id.* ¶¶ 37-52). On April 12th, 2024, Ibarra was marked as absent without an excuse after

missing a class with Dr. Jean-Francois Gaillard despite providing advance notice that he was suffering from severe food poisoning and would be absent. (*Id*. at ¶¶ 37-39). Even though this was the only lecture Ibarra missed, he was not given an opportunity to make up for his absence before it was marked as unexcused. (*Id.* ¶ 40). Ibarra asserts that Dr. Gaillard had provided non-Latino students with excused absences or opportunities to make up absences without penalty in analogous situations. (*Id.* ¶ 39). Because of this unexcused absence, Ibarra received a 50% attendance grade in the course. (*Id.* ¶ 41). Ibarra also asserts that Dr. Gaillard failed to grade several of his assignments in April and May 2024 "inexplicably and without a proper basis," resulting in 0% grades for those assignments and a lower final grade in the course. (*Id.* ¶ 43). The alleged discriminatory treatment Ibarra experienced in Dr. Gaillard's class contributed to his overall GPA dropping below 3.5. (*Id.* ¶ 44).

Ibarra also claims that, during the Spring quarter of 2024, Dr. George Wells assigned him a grade of "K" for his independent research project, a temporary placeholder for a letter grade, with "no legitimate education basis" for doing so. (*Id.* ¶¶ 45-47). Ibarra received this grade despite completing the assigned tasks, contributing additional lab hours beyond what was required, and "exceeding the expectations placed on him." (*Id.* ¶ 46). Months later, and only in response to Ibarra's repeated requests, Dr. Wells assigned Ibarra a "B" in the course. (*Id.* ¶¶ 48-49). This grade, which Ibarra claims is an inadequate reflection of his "sterling performance," lead to a further reduction in Ibarra's GPA. (*Id.* ¶ 49). According to Ibarra, Dr. Wells admitted that the grade was not "indictive of his performance" but instead "reflected the alleged concerns of program faculty and several students that [he] was 'not a good fit' for the [P]rogram." (*Id.* ¶ 50). Other faculty had similarly expressed concerns about Ibarra's "fit" in the Program due to his socioeconomic background. (*Id.* ¶ 51). For instance, during a student-faculty meeting, Ibarra was told by Program

6

faculty that, due to his background, he was "lucky to have made it this far" because Northwestern was a "world class institution." (*Id.* at ¶ 52).

In August 2024, after completing three academic quarters at Northwestern, Ibarra was informed by Northwestern that he was being dismissed from the Program for failing to meet two "candidacy" requirements: (1) he had not found a research advisor by the end of the Summer quarter of 2024 and (2) his 3.43 GPA was less than the 3.5 GPA required for admission to candidacy. (*Id.* ¶¶ 53-54). Ibarra received a formal dismissal letter on August 27, 2024, which reiterated those grounds and stated that Ibarra's "unsatisfactory performance" in the Program was "indicative of a lack of the quantitative skills required to succeed in Ph.D. level research." (*Id.* ¶ 59); (Ex. C, Dkt. 18-3). He was not notified of his right to appeal until August 30, 2024. (Dkt. 27 ¶ 61). The University did not respond to Ibarra's subsequent inquiry as to whether his ten-day deadline to file an appeal began on August 27th or August 30th. (*Id.* ¶ 61-62). On September 4th, 2024, Ibarra appealed his dismissal from the program, alleging disparate treatment and violations of internal policy. (*Id.* ¶¶ 63-64). Ibarra raised all three grounds for appeal laid out by the TGS Handbook. (*Id.* ¶ 65).

On November 20, 2024, Northwestern denied Ibarra's appeal in a "terse and largely standardized letter." (*Id.* at ¶¶ 63- 64); (Ex. D, Dkt. 18-4). First, the University found that Ibarra did not submit evidence supporting his allegations of grade manipulation. (Ex. D, Dkt. 18-4 at 2). In particular, the University noted that Dr. Wells gave a "K" grade to Ibarra and other students to account for projects that were continuing into the summer term. (*Id.*). The University also found that the Program faculty "appropriately exercised academic discretion" in reaching the decision to dismiss Ibarra. (*Id.* at 3). It pointed to evidence showing that Dr. Wells informed Ibarra that his continuance in the Program was subject to an evaluation of his performance in a "dedicated

rotational (trial) position" through Summer 2024. (*Id.*). On August 23, 2024, Dr. Wells told Ibarra that he and other faculty did not think Ibarra was "prepared at present" to continue in the Program given his GPA (under 3.5) and quantitative skills and analysis for lab work. (*Id.*). Based on this, the University decided that the Program faculty appropriately concluded that Ibarra did not have an adviser at the end of Summer 2024 or a GPA of 3.5 or higher, warranting his dismissal. (*Id.*).

Ibarra asserts that, because of Northwestern's actions, he has suffered injuries to his emotional well-being, professional prospects, and reputation. (Dkt. 27 ¶ 67). Northwestern's conduct has also cost Ibarra education-related expenses and delayed his entry into the profession of his choice. (*Id.* ¶ 69). Additionally, Ibarra will have to disclose his dismissal when he applies to other schools, which will impede his ability to continue his education. (*Id.* ¶ 68). In his Complaint, Ibarra alleges racial discrimination in violation of Title VI, the IHRA, and 42 U.S. § 1981 (Counts I-II, VI); breach of implied-in-fact contract (Count III); intentional infliction of emotional distress (Count IV); and negligence (V). (*Id.* ¶¶ 70-86). Ibarra also asserts a claim for damages under the Illinois Civil Rights Remedies Restoration Act (Count VII). (*Id.* ¶¶ 92-95). Northwestern moves to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 16).

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Kaminski v. Elite Staffing*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)). Specifically, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). At the same time, "allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). As such, "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Further, the moving party bears the burden of establishing the insufficiency of the plaintiff's allegations. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020).

## DISCUSSION

### I.     Racial Discrimination (Title VI and Section 1981)

In Counts I and II, Ibarra alleges that Northwestern discriminated against him in violation of Title VI and Section 1981 by denying him full and equal access to its programs because of his race and/or ethnicity. (Dkt. 27 ¶¶ 70-77). Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d. To state a claim under Title VI, a plaintiff must allege that (1) they have been intentionally discriminated against on the grounds of race; and (2) the defendant is a recipient of federal financial assistance. *Khan v. Midwestern Univ.*, 147 F. Supp. 3d 718, 720 (N.D. Ill. 2015). Similarly, Section 1981 prohibits discrimination based on race or ethnicity in the making and forming of contracts. *DJM Logistics, Inc. v. FedEx Ground Package Sys., Inc.*, 39 F.4th 408, 411 (7th Cir. 2022) (citing 42 U.S.C. § 1981). A plaintiff bringing a Section 1981 claim must plead that "(1) they are members of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (*i.e.*, the making and enforcing of a contract)." *Shebley v.*

9

*United Cont'l Holdings, Inc.*, 2020 WL 2836796, at \*3 (N.D. Ill. May 31, 2020) (internal citations omitted). Northwestern only contests the sufficiency of Ibarra's pleadings as to discrimination; it does not dispute that it receives federal funding or that it had an implied contract with Ibarra for the completion of his Ph.D. (*See generally* Dkt. 17). The standards for pleading racial discrimination under Title VI and Section 1981 are the same, and courts analyze such claims together. *See, e.g.*, *Houston v. JP Morgan Chase & Co.*, 2026 WL 26129, at \*8 (N.D. Ill. Jan. 5, 2026) (analyzing Section 1981 and Title VI discrimination claims together after recognizing that the standard for establishing intentional discrimination is the same for both); *Lubavitch-Chabad of Illinois, Inc. v. Nw. Univ.*, 6 F. Supp. 3d 806, 816 (N.D. Ill. 2013), *aff'd*, 772 F.3d 443 (7th Cir. 2014).

For both claims, a plaintiff must allege but-for causation. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020) (holding that, to prevail on a § 1981 claim, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."); *Houston*, 2026 WL 26129, at \*7 ("To state a claim under both statutes, plaintiff must adequately plead that but-for race, he would not have suffered the loss of a legally protected right.") (citing *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181, 289 (2023) (Gorsuch, J., concurring) (holding that "because of" in Title VI invokes "but-for causation")); *Lance v. Betty Shabazz Int'l Charter Sch.*, 2014 WL 340092, at \*8 (N.D. Ill. Jan. 29, 2014) (but-for causation is "the appropriate standard for Title VI" claims) (citing *Reynolds v. Tangherlini,* 737 F.3d 1093 (7th Cir. 2013)). This is a higher standard than the "motivating factor" test used for Title VII claims. *See Peaster v. McDonald's Corp.*, 2023 WL 5387573, at \*3 (N.D. Ill. Aug. 22, 2023) (citing *Comcast*, 589 U.S. at 331-32, 336-37); *see also Mir v. State Farm Mut. Auto. Ins. Co.*, 847 F. App'x 347, 350 (7th Cir. 2021) (allegations that

10

defendant knew of plaintiff's race and "was motivated by discrimination against him" did not satisfy Section 1981's but-for causation pleading standard).

Ibarra alleges in Counts I and II that Northwestern denied him the benefits of its programs and activities "on account of" his "race/ethnicity." (Dkt. 27 ¶¶ 71, 75). Yet, elsewhere in the Complaint, Ibarra also claims that he was mistreated because of his socioeconomic status *and* race. He alleges that his ethnicity and socioeconomic background "were at odds with the programs preferences" (*Id.* ¶ 32); the faculty was biased towards "less esteemed academic institutions whose students are more likely to come from lower socioeconomic backgrounds" (*Id.* ¶ 35); the faculty made comments to him expressing concerning about his "fit" in the Program "due to his socioeconomic background" (*Id.* ¶ 51); and the Program wanted to remove students whose "ethnicity/socioeconomic backgrounds" were not "fits" for the Program (*Id.* ¶ 56). A plaintiff cannot allege multiple discrimination theories as the but-for causes of their mistreatment. *See, e.g., Barzi v. Fermi Rsch. All., LLC*, No. 25 C 9247, 2026 WL 1194748, at *20 (N.D. Ill. May 1, 2026) (Kendall, J.) (dismissing Section 1981 claim where plaintiff alleged sex discrimination, national origin discrimination, age discrimination, disability discrimination, and ethnicity-based discrimination); *Arora v. Nav Consulting Inc.*, 2022 WL 7426211, at *2 (N.D. Ill. Oct. 13, 2022) (dismissing § 1981 claim where plaintiff alleged discrimination based on ethnicity and national origin); *Hill v. Target Corp.*, 2025 WL 919614, at *5 (N.D. Ill. Mar. 26, 2025) (plaintiff failed to allege that race was but-for cause of racial discrimination where she plead the same allegations in support of her gender discrimination claim); *Shah v. Hy-Vee, Inc.*, 2026 WL 221884, at *5 (N.D. Ill. Jan. 28, 2026) (plaintiff failed to plead but-for causation where his complaint "consistently merge[d] multiple reasons for discrimination, suggesting that his discrimination was due to some combination of race, sex, disability, retaliation, or other factors"). By claiming that he was

11

discriminated against because of his race and socioeconomic status, Ibarra has plead himself out of Court.

Ibarra claims that there is no distinction between socioeconomic status and race/ethnicity. (Dkt. 21 at 4). He cites a study from the U.S. Bureau of Labor Statistics in support of this assertion, but no legal authority. (*Id.*). Title VI and Section 1981 prohibit discrimination based on "race." *See* 42 U.S.C. §§ 1981, 2000d. The Supreme Court has defined race as "identifiable classes of persons who are victims of intentional discrimination because of their ancestry or ethnic characteristics." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Ibarra does not point to any case law, nor is the Court aware of any, expanding this definition to include socioeconomic status.[2] As such, for the purposes of anti-discrimination laws, the Court declines to hold that race and socioeconomic status are the same.

"[R]ace-or-ethnicity-based discrimination must have been the determinative reason for" Ibarra's mistreatment. *Arevalo-Carrasco v. Middleby Corp., Inc.*, 851 F. App'x 628, 630–31 (7th Cir. 2021). Since Ibarra alleges that he was discriminated against because of his race and socioeconomic status, which are not the same, his Title VI and Section 1981 claims fail.

## II.    State Law Claims

Ibarra's remaining claims are state law claims: discrimination under the IHRA, breach of contract, intentional infliction of emotional distress, negligence, and a request for damages under Illinois' Civil Rights Remedies Restoration Act. (Dkt. 27 ¶¶ 78-95). Unless and until Ibarra sufficiently pleads a federal law claim, the Court declines to exercise supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3); *see also Royal Canin U. S. A., Inc. v.*

---

[2] While not determinative of the outcome here, the Court notes that it is also unaware of any statute prohibiting discrimination on the basis of wealth or economic status.

*Wullschleger*, 604 U.S. 22, 32 (2025) (recognizing that, under § 1367(c)(3), a federal court need not exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it has original jurisdiction); *Doe-2 v. McLean County Unit Dist. No. 5 Bd. of Dirs.,* 593 F.3d 507, 513 (7th Cir. 2010) ("Ordinarily, when a district court dismisses the federal claim conferring original jurisdiction before trial, it relinquishes supplemental jurisdiction over any state-law claims. . . .").

### CONCLUSION

For the reasons set forth above, Northwestern's Motion to Dismiss [16] is granted. Ibarra's Amended Complaint [27] is dismissed without prejudice.

Virginia M. Kendall
United States District Judge

Date: June 9, 2026

13